# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | |
|---|---|
| **ALECIA M. RIDEAU, M.D.** | **CIVIL ACTION NO. 6:18-CV-00473** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LAFAYETTE HEALTH VENTURES, INC., ET AL.** | **MAG. JUDGE PATRICK J. HANNA** |

## RULING

This is an action brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq*. ("FMLA"). Pending here is a Motion for Summary Judgment [Doc. No. 70] filed by Defendants Lafayette Health Ventures, Inc. ("LHVI"); Lafayette General Health System, Inc. ("LGHS"); Lafayette General Medical Center, Inc. ("LGMC"); and Al Patin ("Patin"), (collectively "Defendants"). Plaintiff Alecia M. Rideau, M.D.'s ("Plaintiff" or "Dr. Rideau") has filed an opposition [Doc. No. 76]. Defendants have filed a reply [Doc. No. 92].

For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. FACTS AND PROCEDURAL HISTORY

Dr. Rideau is a radiologist whose specialty is interpreting breast imaging. [Doc. No. 1 at ¶ 12]. From December 1, 2014, to September 1, 2016, Plaintiff worked at the Breast Center at LGMC. [*Id.* at ¶ 13].

LGHS is the parent company of LHVI and LGMC and is the ultimate employer of all individuals employed by LHVI and LGMC. All Defendants shared the same Human Resources

Department.   The Breast Center is a division of LGMC that provides a wide variety of health care services to women, including, but not limited to, digital mammograms, breast biopsies, ultrasounds, and bone density scans.   [Doc. No. 70-1, p. 8].

Dr. Rideau reported to Craig Ortego, Vice President of Oncology Services ("Ortego"). Friction developed between Dr. Rideau and Ortego almost immediately upon her employment, as Dr. Rideau felt Ortego had not delivered on promises regarding the Breast Center's set-up.   As a result, she felt she had to use substandard equipment, requiring her to work most weekends and preventing her from takiing vacation leave.   [Doc. No. 76-3, p 8-10].

In January 2016, Kayla Kastner ("Kastner") became Breast Center Manager.   The employees of the Breast Center reported to Kastner, except for physicians and mid-level providers, including Dr. Rideau, who continued to report to Ortego.   [Doc. No. 70-7, p.4].

On February 9, 2016, Dr. Rideau was diagnosed with a form of breast cancer.   On February 17, 2016, Dr. Rideau met with Kastner and Ortego to inform them of her recent cancer diagnosis and to discuss the need for FMLA leave to obtain immediate treatment.   Dr. Rideau contends, that at this meeting, Ortego questioned her about her medical decisions and pressured her to use a particular plastic surgeon for breast reconstruction.   She found Ortego's questioning "extremely uncomfortable" and "an invasion of her personal medical decisions."   Dr. Rideau, who is African-American, testified that when Ortego also began to steer her to specific primary care doctors, she sought to cut this discussion off by explaining to him that she already had such a doctor and that she preferred seeing a black female primary care physician.   [Doc. No. 76-3, pp. 28, 29, 46].

Ortego, on the other hand, contends he was merely offering whatever help she needed

with local doctors.

Dr. Rideau alleges that, by February 26, 2016, she had advised Kastner as well as Ortego's Executive Assistant, Donnell Angelle ("Angelle") of her specific leave dates, depending on them to communicate the dates to Ortego. [Doc. No. 76-3, p. 40, 41].

On March 1, 2016, Dr. Rideau's physician faxed the necessary leave documents to LGH's Human Resources Department requesting a total of eight (8) weeks of FMLA to begin on March 28, 2016, for Dr. Rideau to undergo and recover from her surgery. On March 8, 2016, LGH's Human Resources Department issued notice to Dr. Rideau that her request for eight (8) weeks of FMLA leave beginning March 28, 2016, had been approved. [Doc. No. 70-7, p. 26]. Dr. Rideau had previously scheduled vacation from March 14 -25, the two weeks before her FMLA leave was to begin. [Doc. No. 70-7, p. 27]. Thus, her last day at work was March 10, 2016.

Kastner sought Ortego out in person on March 10, 2016 to discuss Dr. Rideau's upcoming vacation and leave start dates with him. Ortego expressed concern, frustration, and disappointment that Dr. Rideau had not provided sufficient notification for the rescheduling of her patients, and Kastner relayed this to Dr. Rideau and suggested that Dr. Rideau speak to Ortego. [Doc. No. 70-7, p. 12].

Dr. Rideau refused to speak to Ortego. Later the same day, Ortego went to a meeting at the Breast Center that included Dr. Rideau to discuss issues with physician coverage during the time period that Rideau was scheduled to be on leave. Dr. Rideau left the meeting immediately after Ortego walked into the room, testifying she did not want a confrontation and wanted to leave peacefully on the last day before her vacation and FMLA leave. [Doc. No. 76-3, p. 49].

That same afternoon, Dr. Rideau's then-attorney, Jeff Ackermann, emailed Gordon Rountree, LGH General Counsel ("Rountree"), advising that Dr. Rideau "is having a problem with Craig Ortego. This time it is about the way in which Dr [sic] Rideau got her leave approved..." The Ackermann email does not mention the FMLA, but says that it "[m]ight be time to clear the air between the two." [Doc. No. 70-8, p. 27].

Rountree contacted Patrick Gandy, CEO of LGMC and Executive Vice President of LGH ("Gandy"), regarding the Ackermann email, and Gandy made the decision to handle the subject of the Ackermann email internally. Gandy was already aware of personality conflicts between Dr. Rideau and Ortego, as he had addressed several of those conflicts and had interposed Kastner and Chris Major, Director of the Cancer Center of Acadiana, as buffers between Dr. Rideau and Ortego. [Doc. No. 70-6, p. 6]

On March 16, 2016, after she was already on FMLA leave, Dr. Rideau submitted to Sheena Ronsonet, LGH Vice President of Human Resources ("Ronsonet"), and to Rountree, her own complaint regarding the events of March 10. Ronsonet conducted an investigation of Dr. Rideau's complaint and recommended that Dr. Rideau and Dr. Megan Daigle ("Dr. Daigle"), the other Breast Radiologist in the Breast Center, be moved under the supervision of Al Patin ("Patin"), Chief Administrative Officer of LHVI and Senior Vice-President of LGHS, while the rest of the Breast Center remained under the supervision of Ortego. Defendants contend this was done as an accommodation to Dr. Rideau as a result of her complaint against Ortego and their deteriorating relationship. [Doc. No. 70-6, p. 5].

Following Dr. Rideau's return from FMLA leave on May 23, 2016, her relationship with Dr. Daigle, Ortego, and the Breast Center staff allegedly continued to deteriorate, culminating in

4

a number of instances of interpersonal conflicts and issues.   Defendants allege that these

conflicts included:

    a.    Dr. Rideau complained to the Breast Center staff that it was unfair that the LGH Defendants hired another physician to assist Dr. Daigle while Dr. Rideau was out.

    b.    Dr. Rideau berated Kastner in front of a staff member because a patient who had been scheduled at the last minute the day before was not ready for the scheduled appointment time. As a result, the staff member became very upset and blamed herself for a situation beyond her control.

    c.    Dr. Rideau was not in the Breast Center when she was to meet with patients, and the staff was unable to locate her.

    d.    Dr. Rideau accused Dr. Daigle of not reading enough diagnostic screens. Then, when Dr. Daigle attempted to read more, Dr. Rideau accused her of picking the "easy ones" for herself and leaving the "hard ones" for Dr. Rideau, which, she alleged, affected her workflow.

    e.    Dr. Rideau spoke negatively about Dr. Daigle to Breast Center staff members.

[Doc. No. 70-11, pp 85-89].

Dr. Rideau forcefully disputes Defendants' versions of these conflicts, and further

contends that much of the friction was generated by Dr. Daigle's frustration for having to cover

for Dr. Rideau during her leave and vacation.

While Dr. Rideau was out on FMLA leave, and continuing on throughout her remaining

tenure of employment, she began to consider whether and when to have second stage

reconstruction surgery as a follow up to her first surgery.

Dr. Rideau alleges that Patin was less than cooperative in this process.   Dr. Rideau

contends that on the day she returned to work, May 23, 2016, she emailed Patin referencing her

desire to have reconstruction in 2016, stating that she was sorry her FMLA leave had placed a burden on Dr. Daigle. Dr. Rideau testified that, prior to writing this email, she had a phone conversation with Patin in which he told her that Dr. Daigle was tired and that he was worried about her being burnt out. [Doc. No. 76-3, p. 55-56].

Around May 30, 2016, Dr. Rideau met with Patin and told him that her doctor recommended she have her reconstructive surgery four to six months later. Dr. Rideau alleges that, in response, Patin referred to her surgery as elective and cosmetic and conditioned her taking leave in 2016 upon her obtaining someone to cover her work during her absence. Dr. Rideau further alleges that in a later meeting, Patin told her that she could take no further FMLA leave in 2016 because Dr. Dartez could not cover full week stretches. Dr. Rideau testified that Patin stated, "You will have to put off your surgery until 2017." [*Id*., at 58-60]

Dr. Rideau further alleges that Patin told Dr. Rideau in a July 7th meeting that she did not work as hard as Dr. Daigle, to which she responded that he should look at the numbers. [Id., at 70].

On July 9, 2016, Dr. Rideau complained to Patin that she had been chastised by Kastner for not informing Ortego in person of her FMLA leave. Dr. Rideau then described how Kastner was continuing to mistreat her and was extremely critical of her. Dr. Rideau stated that "[m]y general sense is that Kayla [Kastner] will report anything negative about me to anyone to cause trouble for me." [*Id*.]

Patin disputes Dr. Rideau's accounts. He asserts that he did not say that her reconstructive surgery was cosmetic or decline to permit her to take FMLA in 2016. He further denied conditioning her FMLA leave upon her obtaining another doctor to cover for her. When

6

asked whether he told Dr. Rideau her medical leave had been an inconvenience, he stated "I don't know if I said it in that way." He denied telling Dr. Rideau that she would have to wait until 2017 to have her breast reconstruction. [Doc. No. 76-14, p. 12-14].

With respect to the complaint about Kastner, Patin testified he did not know if he addressed the complaint or even forwarded it to HR. Patin further testified that he did not consider the complaint FMLA-related and did not consider getting HR involved. [Id.at 26].

Dr. Rideau did not report Patin for allegedly interfering with and denying her leave. She contends that she just wanted to be able to do her job in peace, without any more chaos, and that she did not want confusion with Patin or anyone else. [Doc. No. 76-3, p. 65].

Defendants assert that, on July 29, 2016, they became aware that Dr. Daigle was considering leaving the Breast Center because of the continuing interpersonal issues with Dr. Rideau. [Doc. No. 70-5, p. 13]. Consequently, according to Defendants, during the time period between July 29, 2016, and August 4, 2016, the decision was made to terminate Dr. Rideau's contract "without cause." [Doc. No. 70-1, p. 21]

However, this alleged decision was not communicated to Dr. Rideau, and she continued efforts to schedule her leave for reconstruction surgery. On August 15, 2016, Dr. Rideau emailed Patin that her doctor had scheduled her for surgery on March 13, 2017, and that she would be taking two weeks of medical leave then. [Doc. No. 70-10, p. 46].

Defendants contend that Dr. Rideau's termination was temporarily postponed as a result of the historic flooding in the Lafayette area in August 2016, which affected their attorney Mr. Roundtree. [Doc. No. 70-2, p. 10]. On September 1, 2016, Patin and Ronsonet met with Dr. Rideau to inform her of the decision to exercise the "without cause" termination provision in her

Employment Agreement.

As required by the Employment Agreement, LGH paid Dr. Rideau for the full six months (one hundred eighty days) of the notice of termination period, ending on February 28, 2017, on the following pay day.

On April 6, 2018, Dr. Rideau filed this lawsuit against Defendants, including Patin individually, alleging two claims for relief: (1) interference under the FMLA, in that Defendants illegally denied her FMLA leave; and (2) retaliation under the FMLA, in that Defendants retaliated against Plaintiff for exercising her FMLA rights, culminating in her termination from employment.   [Doc. No. 1].

Dr. Rideau alleges that, after she was diagnosed with breast cancer, took FMLA leave to have a double mastectomy, complained about retaliation associated with exercising FMLA rights, and requested a second FMLA leave for breast reconstructive surgery, Defendants terminated her employment.   [*Id*. at ¶¶ 14, 22, 34 and 35].

Here, Defendants seek summary judgment on the basis that (1) Defendant Patin individually is not an "employer" subject to FMLA liability; and, (2) Dr. Rideau cannot establish any FMLA violation by Defendants.

Dr. Rideau opposes the motion on both grounds.   This matter is ripe for review.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

**B.     Analysis**

**1.     Is Patin an "Employer" as Defined by the FMLA and therefore Individually Liable?**

Defendants assert that Patin cannot be personally liable for FMLA violations because he is not an "employer" as defined by the Act.

Dr. Rideau opposes summary judgment, alleging that Patin is liable in his personal capacity for violating the FMLA because he was her supervisor at the time of her termination and, as such, he exercised control over her in the decision to terminate her employment. [Doc. No. 1, ¶ 10].

Pursuant to the FMLA, an "employer" is defined as follows:

> [A]ny person engaged in commerce or in any industry or activity affecting commerce, who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer, any successor in interest of a covered employer, and any public agency.

29 C.F.R. § 825.104(a). This definition is substantially identical to the definition of "employer" under the Fair Labor Standards Act ("FLSA")[1], and, accordingly, courts look to FLSA precedent when applying the FMLA. See Modica v. Taylor, 465 F. 3d 174, 186 (5th Cir. 2006)

The Fifth Circuit has held that FLSA's definition of employer is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 329 (5th Cir. 1993).

To determine if an individual is an employer under the FLSA, the Fifth Circuit has stated that courts should consider "whether the alleged employer (1) has the power to hire and fire the

---

1 The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id*.; see 29 U.S.C. § 203(d).

employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Watson v. Graves*, 909 F.2d 1549, 1553 (5ᵗʰ Cir. 1990) (internal citations omitted).

Defendants contend that Dr. Rideau cannot show that Patin possessed the level of authority sufficient to meet this standard of liability. Although Patin was Dr. Rideau's supervisor, Defendants contend that he did not have the power to hire and fire employees, did not supervise and control employee work schedules or conditions of employment, did not determine the rate and method of payment, and did not maintain employment records.

In support of his position, Patin points to his job description which describes his position generally as being "responsible for providing overall leadership, growth, marketing, administration, and performance of all aspects of the employed physician network's (Group) activities to ensure accomplishment of its objectives. This position will supervise managers and oversee the activities of all staff and will report to the President/CEO." [Doc. No. 70-10, p. 27]. He asserts he had only these personnel responsibilities:

> 1. Coordinate[] the recruitment, development, and performance evaluations of staff.
>
> 2. Assist[] with physician recruiting efforts.
>
> 3. Monitor[] fringe benefit & compensation programs for physicians and staff.
>
> 4. Maintain[] strictest confidentiality and professionalism.

Given this limited scope of authority, Patin argues that he was not able to unilaterally hire and fire employees, supervise and control their work schedules, or maintain the personnel records. He argues further that neither the "Financial Responsibilities" nor the "Managerial

Financial Responsibilities" portions of his job description authorize him to determine employee salaries or method of payment. Defendants thus conclude that Patin's job description negates Dr. Rideau's claim that he is liable to her as her "employer" under the FMLA.

Dr. Rideau, on the other hand, contends that LGHS was the parent corporation of the co-defendants, the "ultimate employer" of all the employees involved in this case, and an FMLA employer of Dr. Rideau. She further asserts that Patin was a corporate officer "acting in the interest of an employer" because LGHS employed and appointed Patin to provide executive service to LGHS in the capacity of Senior Vice President and Chief Administrative Officer of LGHS's wholly-owned subsidiary LHVI. In this position, Dr. Rideau argues that Patin had the requisite power to exercise control on behalf of LGHS and he exercised that control with respect to Dr. Rideau.

In support of her position, Dr. Rideau points to (1) Patin's power as a corporate officer; (2) his control over leave dates and the process for clearing them; (3) his involvement in the termination process; and (4) his direct involvement in the decision to terminate her. Dr. Rideau contends that by June 6, 2016, Patin had informed her that he would provide her with official guidelines for requesting time off to facilitate scheduling with Dr. Daigle. However, Patin never provided the promised written leave guidelines to Dr. Rideau, thereby violating the FMLA. Id.; See 29 C.F.R. § 825.300(c)(5) ("Employers are also expected to responsively answer questions from employees concerning their rights and responsibilities under the FMLA.")

Moreover, Patin, along with Gandy, decided to fire Dr. Rideau and did so. Additionally, Patin signed Dr. Rideau's termination letter and presided over her termination meeting. [Doc. No. 76-3, p. 94].

Having reviewed the evidence presented, the Court finds that Patin is entitled to judgment as a matter of law that he is not an "employer" for purposes of the FMLA.

When taken out of context, the phrase "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer," potentially implicates a broad swath of low-to-mid-level supervisors. *See Donovan v. Agnew,* 712 F.2d 1509, 1513 (1st Cir.1983) ( "Taken literally and applied in this context [the FLSA definition of "employer"] would make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees"); *Dole v. Cont'l Cuisine, Inc.,* 751 F.Supp. 799, 802 (E.D.Ark.1990). However, as noted by the First Circuit, "[i]t makes more sense . . . to interpret that language as intended to prevent employers from shielding themselves from responsibility for the acts of their agents." *Agnew,* 712 F.2d at 1513.

Neither the Supreme Court nor the Fifth Circuit have used the FMLA/FLSA definition of "employer" to hold low-to-mid-level supervisors liable as FMLA "employers." Instead, those courts have applied the language only to persons or entities exercising almost total control over the employees of a nominally separate entity. For example, in *Falk v. Brennan,* 414 U.S. 190, (1973), the Supreme Court found a partnership managing apartment complexes to be an FLSA "employer" of maintenance workers, who were employed directly by apartment complex owners. *Id.* at 195. The Court held that, even though the employees were not directly employed by the management partnership, the partnership's "managerial responsibilities at each of the buildings, which gave it substantial control of the terms and conditions of the work of these employees," made the partnership an "employer" under the FLSA. *Id.*

Likewise, in *Donovan v. Grim Hotel Co.,* 747 F.2d 966 (5th Cir.1984), the Fifth Circuit held that an individual, who founded, controlled, and profited from hotel businesses was an FLSA "employer" along with the hotel enterprise itself. *Id.* at 971–72. The Fifth Circuit approvingly cited to the First Circuit for the proposition that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Id.* at 972 (citing *Agnew,* 712 F.2d at 1511). The Fifth Circuit pointed to "the economic realities" of employment to uphold a verdict against the individual defendant, who "independently exercised control over the work situation." *Id.* Specifically, the record showed that the individual defendant began and controlled the hotel corporations; held their purse-strings and guided their policies; was the only one who could authorize compliance with the FLSA; personally selected the manager of every hotel; and travelled to Texas to inspect the hotels and solve major problems. *Id.* "In short, the hotels, speaking pragmatically, were [the individual defendant's] and functioned for the profit of his family." *Id.*

Nearly a decade later, in *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324 (5th Cir. 1993), the Fifth Circuit imposed FLSA liability on an individual "employer." There, a non-owner individual, who did not control the day-to-day operations of a nightclub, was found to be an employer where he was the "driving force" behind the business; he hired two of the nightclub dancers who testified at trial; several witnesses identified him as their supervisor and testified that he gave specific instructions to employees; when he was at the nightclub, the dancers were required to dance his favorite songs; he removed money from the business's safes; he signed employees' payroll checks; he ordered one employee to refrain from keeping records of tips; and

14

he spoke for the business during an investigation of possible FLSA violations. *Id.* at 329. The Fifth Circuit affirmed the district court's determination that the individual was an FLSA "employer," citing to the regulatory definition.

Here, unlike the individual defendants in *Falk, Grim Hotel,* and *Reich,* Patin's managerial control over employees and decision-making powers was limited. Patin did not have almost exclusive and unfettered control over the "terms and conditions" of Dr. Rideau's employment or ability to take FMLA leave. Unlike the individual owner/executive defendant in *Grim Hotel,* Patin did not "independently exercise control over [Plaintiff's] work situation." 747 F.2d at 972. Finally, unlike the non-owner individual in *Reich,* Patin was not the "driving force" behind Defendants. 998 F.2d at 329. The evidence shows that Patin did not "effectively dominate [Defendant's] administration or otherwise act[ ], or [have] the power to act, on behalf of [Defendant] vis-a-vis its employees." *Id.*

Accordingly, the Court finds Patin is not an FMLA employer and Defendants' Motion for Summary Judgment is GRANTED.

### 2. Can Dr. Rideau Establish a FMLA Violation?

#### a. Interferance

The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise, or attempt to exercise, of any right provided by the FMLA. 29 U.S.C. § 2615(a)(1).

To establish a prima facie interference case, Dr. Rideau must show all of the following elements: (1) she was an eligible employee, (2) her employer was subject to the FMLA's requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, (5) her employer interfered with, restrained, or denied her the benefits to which she

was entitled under the FMLA, and (6) she was prejudiced thereby.  *Jiles v. Wright Med. Tech., Inc*., 313 F.Supp.3d 822, 844 (S.D. Tex. 2018); *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017); *See Lanier v. Univ. of Texas Sw. Med. Ctr.,* 527 F. App'x 312, 316 (5th Cir. 2013); *see also Cuellar v. Keppel Amfels, L.L.C.,* 731 F. 3d 342, 347 (5th Cir. 2013).

The employee must point to evidence of prejudice. *Jones v. Children's Hosp*., 58 F.Supp.3d 656, 668-69 (E.D. La. 2014). Prejudice exists when an employee loses compensation or benefits by reason of the violation or suffers some loss in employment status.  *Id*.at 669.   An interference claim does not require a showing of discriminatory intent.  *Id*.at 668.

i.    The Events of March 10

Dr. Rideau first contends that the March 10, 2016 events amount to interference, discrimination, and/or retaliation under the FMLA.   She argues that, when she requested FMLA leave for her first surgery, she encountered criticism from Ortego and Kastner.

Defendants responds that the FMLA requires all such claims to be brought within two years of the alleged violation, unless such violation was "willful."   Dr. Rideau filed this action on April 6, 2018, more than two years later. Defendants contend that Dr. Rideau cannot show any genuine issue of material fact to support a finding that the alleged violations of the FMLA occurring on March 10 were willful and, as a result, would not be subject to the two-year statute of limitations.

Defendants further argue that, even if this Court were to find that Dr. Rideau's claims based on the events of March 10 are timely, they are not actionable.   There are two March 10 occurrences at the root of Dr. Rideau's claims: (1) a conversation between Dr. Rideau and Kastner that is entirely hearsay, and (2) a meeting lasting "seconds," during which zero remarks

were made to or by Dr. Rideau.   Defendants assert Rideau has not established FMLA interference or retaliation arising out of either.

Dr. Rideau responds that she is not asserting that the events in March 2016 give rise to stand-alone FMLA claims.   She does assert that conduct, even if time-barred, "is relevant...and may be used...to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives." *Cortes v. Maxus Exploration Co*., 977 F.2d 195,198(5thCir. 1992). She further contends that Ortego's and Kastner's pre-leave statements and actions are relevant to the interference and retaliation Dr. Rideau experienced following her return in late May 2016, and her termination on September 1, 2016.

The Court agrees with Dr. Rideau that a defendant's conduct, both outside and inside the applicable statutes of limitation, is admissible to show retaliatory intent.   Evidence of such conduct is probative of the "real reasons" behind a defendant's pretextual actions, culminating in the termination of an employee.   *See Wheat*, 811F.3d at710 (employer conduct 7 years before plaintiff's termination supported reversal of summary judgment on FMLA retaliation claim); *Schram v. Dow Corning Corp*., 2018 WL 317870 (E.D. Mich. 2018). Such evidence is admissible as relevant background. *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113(2002); *Cortes*, supra.

     ii.   Events Occurring After March 10, 2016

Dr. Rideau alleges that Defendants interfered with her rights when she attempted to schedule FMLA for her reconstructive surgery.   She contends that Patin first told her that her surgery was cosmetic and elective and, therefore, she would have to obtain her own coverage to take leave in 2016.   Then he told her she could not take leave in 2016 and would have to wait

until 2017.   Finally, when Dr. Rideau presented Patin with her 2017 leave dates, she was immediately terminated.

Defendants respond that, reduced to its essence, the crux of Dr. Rideau's FMLA interference claim is that she told Patin that she may want to take FMLA leave sometime in late 2016, and Patin "denied" this "request" because he asked that Dr. Rideau retain coverage and/or schedule the foreseeable treatment in early 2017.   Defendant contends that Patin's alleged "interference" was within the bounds of the FMLA which provides:

> In any case in which the necessity for leave under subparagraph (C) or (D) of subsection (a)(1) or under subsection (a)(3) is foreseeable based on planned medical treatment, the employee—
>
> (A)    shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee or the health care provider of the son, daughter, spouse, parent, or covered servicemember of the employee, as appropriate; and
>
> (B)    shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

29 U.S.C. § 2612(e)(2).   Defendants thus conclude that Dr. Rideau had a mandatory obligation to consult with the employer and make a reasonable effort to schedule treatment so as not to disrupt the employer's operations.

Defendants further assert there was no FMLA violation because the decision to terminate Dr. Rideau's employment was made before her request for FMLA leave for her reconstructive surgery.   In support of their argument, Defendants refer to their own internal emails.

The Court finds there are genuine issues of material fact which preclude judgment as a matter of law on the issue of interference. Of particular concern to the Court is the short time frame between Dr. Rideau's return from FMLA leave (the end of May 2016), her endeavors to obtain additional FMLA (the end of May 2016 to August 2016), and her termination almost immediately after she emailed Patin that her doctor had scheduled her for surgery on March 13, 2017, and that she would be taking two weeks of medical leave then.

While Defendants contend that their decision was made before her second request, it is undisputed that the decision was made after her use of FMLA for her first surgery. Further, the timing of Defendants' actions here could lead a reasonable finder of fact to conclude that Defendants chose to preemptively terminate Dr. Rideau before she could exercise her rights. In *Butler v. IntraCare Hosp. North*, 2006 WL 2868942, at *4-5 (S.D. Tex. Oct. 4, 2006), the court wrote:

> Such a preemptive denial or interference would be unlawful. The FMLA prohibits both the interference with "the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1) (emphasis supplied). And under the regulations, "[a]n employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act." 29 C.F.R. § 825.220(a)(1) (emphasis supplied). The regulations elaborate on "interfering with." " 'Interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA ...." 29 C.F.R. § 825.220(b) (emphasis added). Such "manipulation" would logically include terminating an employee to avoid providing FMLA leave to which an employee was otherwise entitled.

*Id*.at 5.

Credibility determinations have no place in summary judgment proceedings because a non-movants summary judgment evidence must be taken as true. *Waste Management of Louisiana*, *LLC v. River Birch, Inc*., 920 F. 3d 958, 964 (5th Cir. 2019). Moreover, "when state of mind is an essential element of the nonmoving party's claim, it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility." *Id*. (quoting *International Shortstop, Inc. v. Rally's Inc*., 939 F.2d 1257, 1265 (5th Cir. 1991)).

Here, a jury could find that Defendants committed acts similar to those described in *Butler* by discouraging Dr. Rideau from utilizing her leave in 2016 for reconstructive surgery and then refusing to authorize her leave or preemptively terminating her once she settled on 2017 leave dates. Accordingly, Defendants' Motion for Summary Judgment is DENIED as to the claim of interference related to Dr. Rideau's reconstructive surgery.

### b. Retaliation

Defendants also move for summary judgment on Dr. Rideau's retaliation claim under the FMLA.

The FMLA "prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. §825.220(c). An employer is further prohibited from discharging or in any other way discriminating against any person . . . for opposing or complaining about any unlawful practice under the [FMLA]." 29 C.F.R. §825.220(a)(2).

An FMLA retaliation claim requires the employee to set out a prima facie case of

retaliation that: (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action. *Wheat v. Florida Parish Juvenile Justice Com'n*, 811 F.3d 702, 705 (5th Cir. 2016).

Defendants do not dispute that Dr. Rideau engaged in protected activity and that the termination of her contract constitutes a materially adverse action under the FMLA. [Doc. No. 92, p. 35]. However, they contend Dr. Rideau cannot prove the causal link.

Dr. Rideau contends that, after going on leave, she was subjected to intense scrutiny by Kastner who had been ordered to report by Patin and Ronsonet. Further, the decision to terminate her was allegedly made on August 4, 2016, approximately two (2) months later. Patin Dep., Ex. L, p. 126-27. Additionally, her termination occurred on September 1, 2016, approximately three (3) months later. Finally, within days of supplying Defendants with leave dates for her second surgery, they immediately terminated her.

Dr. Rideau further argues that courts routinely deny summary judgment on FMLA interference and retaliation claims, if there is evidence that the employer expressed frustration about the employee's use of FMLA leave, made negative comments about FMLA leave, or harassed an employee about taking leave. *See e.g.,McArdle v. Dell Product, L.P.*, 293 Fed. App'x. 331, 338 (5th Cir. 2008) (finding that allegations created an inference of retaliatory causation where there was "evidence that [Plaintiff's] supervisor was 'frustrated' with his absences and expressed concern about his attendance."); *Hartman v. Lafourche Parish Hosp.*, 262 F. Supp. 3d 391, 397(E.D. La. 2017) (evidence of pretext included negative comments from supervisor that plaintiff's medical leave had left her "in a bind."); *Goff v. Singing River Health Sys.*, 6 F. Supp. 3d 704 (S.D. Miss. 2014) ("Where a decision-maker, or a person who provided

input into the decision, expressed feelings around the time of, and in reference to, the adverse employment action complained of, then it may be possible to infer that the decision makers were influenced by those feelings in making their decisions).

Dr. Rideau therefore argues that a reasonable juror could conclude that Defendants possessed retaliatory animus and, thus, she has established a prima facie case of retaliation.

The Court finds that Dr. Rideau's arguments are persuasive. Accordingly, for that reason, and for the reasons cited by the Court on the interference claim, above, the Court finds that Defendants are not entitled to summary judgment on Dr. Rideau's retaliation claim.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 70] is GRANTED IN PART and DENIED IN PART. To the extent Defendants contend that Defendant Al Patin is not an "employer" subject to FMLA liability in his personal capacity, the motion is GRANTED. In all other respects, the motion is DENIED.

Monroe, Louisiana, this 17th day of May, 2019.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**